## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Aziza DeBrossard-Sharp ) | | |
| 8326 Gibbs Way ) | | |
| Landover, Maryland 20785 ) | Civil Action No. 21-1524 | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | | |
| ) | | |
| Amalgamated Casualty Insurance Co. ) | JURY TRIAL DEMANDED | |
| 8401 Connecticut Ave., Suite 105 ) | | |
| Chevy Chase, Maryland 20815 ) | | |
| ) | | |
| Defendant. ) | | |
| ) | | |

### COMPLAINT

**COMES NOW**, Plaintiff Aziza DeBrossard-Sharp ("Ms. DeBrossard-Sharp" or "Plaintiff"), by the undersigned counsel, and complains of Defendant Amalgamated Casualty Insurance Company ("ACIC"), as follows:

### INTRODUCTION

1. This is an action authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. ("Title VII"), the Civil Rights Act of 1866, Section 1981(a) ("Section 1981"), and the Maryland Fair Employment Practices ACT (FEPA). Md. Code §20-601 *et seq*., for the Defendant's discrimination based upon her race (African American), and sex/gender (female), and in retaliation against Plaintiff for her statutorily-protected activity.

2. Additionally, Plaintiff brings this case for her breach of contract to recover damages as a result of her unlawful and discriminatorily-based termination from her position as a

1

Commercial Claims Adjuster at Amalgamated Casualty Insurance Company located in Chevy Chase, Maryland.

## JURISDICTION AND VENUE

1. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331 as it asserts a claim that arises under the Constitution, laws or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*., and Section 1981, to redress and enjoin the employment practices of the Defendant.

2. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

3. This Court has subject matter jurisdiction over this suit pursuant to 42U.S.C.§ 2000e-16(a) and (c), incorporating 42 U.S.C. § 2000e-5(f) (3).

4. Venue is proper pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), because the events and business records that give rise to the issues in this Complaint occurred in this District.

## THE PARTIES

5. Plaintiff, Aziza DeBrossard-Sharp, is an adult resident and domiciliary of the State of Maryland. In addition to being a successful insurance adjuster, assisting clients in their most troubled times, Ms. DeBrossard-Sharp has a personal interest in philanthropy and providing for her local community.

6. Defendant, Amalgamated Casualty Insurance company, is an insurance carrier domiciled in both the District of Columbia and the State of Maryland, with its principal place of business in the State of Maryland.

**EXHAUSTION OF REMEDIES**

7. Plaintiff has exhausted all of her administrative remedies.

8. Plaintiff filed a charge with the Washington Field Office of the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on race (African American), sex (female), and retaliation (prior statutorily protected activity).

9. On March 23, 2021, the EEOC issued Plaintiff a Right-to-Sue Letter, which Plaintiff received on March 26, 2021.

10. Accordingly, Plaintiff timely files this action in accordance with the Notice of Rights, which provided Plaintiff the right to file this Complaint within 90 days of receipt of the Notice.

**NATURE OF THE ACTION**

11. Plaintiff brings this action to recover all legal and equitable remedies available for Defendant's discrimination and retaliation in violation of Title VII, Section 1981, and FEPA, including back pay, front pay, and compensatory damages in an amount to be determined by the jury that would fully compensate her for the economic loss, physical and psychological injury, humiliation, embarrassment, and mental and emotional distress, prejudgment interest, attorneys' fees, expenses, and costs of the action.

12. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, emotional tranquility and denial of her constitutional and statutory rights.

**FACTS COMMON TO ALL COUNTS**

13. On or around April 19, 2018, the Plaintiff was offered a position as a Commercial Claims Adjuster by the Defendant. The offer stipulated that the Plaintiff would be permitted to work remotely for the duration of her tenure, be provided specific benefits such as paid

vacation and employer-contributed healthcare, as well as commensurate compensation. The Plaintiff emphasized to the Claims Manager, Andrew Lee, that her acceptance of said offer was contingent on the fulfillment of working remotely at least three (3) days a week due to her long commute. Mr. Lee agreed to these terms, and the Plaintiff accepted the offer, accordingly.

14. On or around May 14, 2018, the Plaintiff began working for the Defendant in person.

15. On or around June 2018, while still reporting to the office in person, the Plaintiff requested a status update regarding their agreement that the Plaintiff telework at least three (3) days a week. In response, the Defendant informed the Plaintiff that they were still coordinating the logistics.

16. On or around July 10, 2018, while still reporting to the office in person, the Plaintiff requested a status update regarding their agreement that the Plaintiff telework at least three (3) days a week. The Defendant informed the Plaintiff that they did not currently have the proper equipment to provide the Plaintiff, but that they were working to obtain this equipment.

17. On or around August 2018, while still reporting to the office in person, Claims Manager Andrew Lee informed the Plaintiff that the Defendant was still working on obtaining the required equipment necessary to enable the Plaintiff to work remotely. Mr. Lee further conveyed to Plaintiff that the Defendant did not currently possess enough funds in their budget to purchase new equipment, and that they would also not permit the Plaintiff to utilize her personal devices for company use, despite her being able to access the company database with these devices.

18. On or around September 2018, while still reporting to the office in person, Plaintiff contacted the Claims Director and Human Resources Consultant to discuss the previously agreed upon vacation time as stipulated in her offer. During this discussion, both the Claims Director and Human Resources Consultant became extremely combative and aggressive towards her. During that hostile meeting, Plaintiff provided the email from the Claims Manager that detailed the agreed upon vacation time, which assisted in temporarily resolving the dispute about the matter.

19. On or around November 20, 2018, while still reporting to the office in person, the Plaintiff received an email from the Claims Management Office that stated the Plaintiff no longer has settlement authority, which effectively removed one of her duties. The Claims Manager, Andrew Lee, then immediately called the Plaintiff to discuss the email further. During the call, Mr. Lee informed Plaintiff that her settlement authority was rescinded because she extended an offer for a claimant that was less than the medical bills they provided. In response, Plaintiff informed Mr. Lee that the basis of her decision was legitimate, that the file note provided her evaluation and explanation of the offer, and that he should refer to that to understand her decision-making process in the matter. Unexpectedly, Mr. Lee then began to yell at Plaintiff and informed her that all future settlement offers for her claims must first go through Claims Management, first. The Plaintiff asserted that the settlement offer was within her authority at the time, and that she was not informed that she could not extend an offer for less than the medical costs that the claimant had provided. The Plaintiff further explained that upon closer inspection, the medical expenses that the claimant had submitted were unrelated to the accident in question, and that is why she had offered a lower settlement price. Strangely, although Mr.

Lee agreed with Plaintiff's reasoning, he continued to assert that Plaintiff still has her settlement authority revoked. Plaintiff noted to Mr. Lee that this type of reprimand is unwarranted, considering her new employee status, the misinformation she was given regarding settlement offers, the lack of training provided to her, and the low likelihood that this would be repeated. Mr. Lee informed Plaintiff that he and the Claims Director both review claims similarly, since they were both previous employees of Nationwide Insurance. The Plaintiff replied that while this is true, most of the subordinate employees previously worked for other companies who have their own approach to claim evaluation and therefore the discussion should have been one based upon teaching and not reprimanding, particularly when the delivery was aggressive, demeaning, and debasing.

20. On or around November 21, 2018, while still reporting to the office in person, the Claims Manager called Plaintiff to discuss a towing claim. During the call, the Claims Manager began to berate the Plaintiff, alleging that she had mishandled the claim. The Plaintiff responded by stating that the Claims Manager had provided the information to Plaintiff in a previous call and instructed her to handle the claim in the very manner in which she handled it. The Claims Manager then realized his mistake, apologized, and ended the call.

21. On or around November 21, 2018, while still reporting to the office in person, the Plaintiff attended a claims meeting. During this meeting, the Claims Manager informed the team members that a new Claims Adjuster would be joining the team from Nationwide Insurance. The Claims Manager stated that this new adjuster would be working remotely starting on December 3, 2018.

22. On or around November 28, 2018, while still reporting to the office in person, the Plaintiff received an email from the Claims Manager. Less than a minute after receiving this email,

the Claims Manager called Plaintiff to discuss the same non-urgent claim that was the topic of the email. The Plaintiff informed the Claims Manager that while she had received the email, she had not yet had an opportunity to review its contents. The Claims Manager then began yelling at the Plaintiff, without justification. Despite the hostility, the Plaintiff attempted to defuse the situation, to no avail. Plaintiff asserted that the behavior from the Claims Manager was unprofessional, created a hostile work environment, and that she had been subjected to this type of behavior from both the Claims Manager and the Claims Director. The Plaintiff further informed the Claims Manager that the Claims Adjusters, including herself, have requested, on several occasions, for their processes to be placed in writing to better meet the expectations of management, and that management was continuously altering their expectations without first communicating them. The Claims Manager replied that this responsibility lies with the Claims Director, not him. This entire interaction was witnessed by another employee, "LL", who had been present in the Plaintiff's office.

23. On or around December 14, 2018, while still reporting to the office in person, the Plaintiff received a claim that had been reassigned from another employee. This employee (Caucasian, male) had failed to respond to a time limit demand and then exacerbated the situation by becoming combative with the claimant's attorney. As a result, the claimant's attorney threatened to file suit against the Defendant for this error, which would have put the insured at risk, and would have caused a financial strain on the company. Despite this egregious behavior, this Claims Adjuster, who is a Caucasian male, was not reprimanded or faced any consequences for his behavior. The Claims Manager informed Plaintiff that while he was aware that she already had a full case load, the Claims Director himself had

requested that the Plaintiff be the one to handle the claim, and expected weekly status updates on this claim, which was unusual and contrary protocol.

24. On or around December 19, 2018, while still reporting to the office in person, the Plaintiff received a phone call from the Claims Manager, Andrew Lee. The Claims Manager informed Plaintiff that no employee in the Claims Department would receive a bonus or a raise because it was not available in the budget. Although Mr. Lee advised Plaintiff that she had met all of the qualifications, he still indicated that she would still not be receiving a bonus. When Plaintiff pushed for more information, Mr. Lee sharply replied, "Look, you're the highest paid person in this department under management." Nevertheless, it was later determined that several Caucasian employees received bonuses that year including Claims Management, but Plaintiff, who is African American, did not.

25. On or around January 16, 2019, while still reporting to the office in person, Plaintiff received a call from Mr. Lee, Claims Manager. During that call, Mr. Lee reprimanded Plaintiff after a Claims Supervisor sent a berating email to Plaintiff that was actually intended for another Claims Adjuster. Plaintiff informed Mr. Lee that this email was sent in error and that she had provided the Claims Supervisor with the proper email for the Claims Adjuster that he was actually attempting to contact. Without acknowledgement of this error, the Claims Manager then reprimanded Plaintiff for a different issue—not signing onto Skype, the web-based video call platform—even though the Claims Manager was aware that the platform was experiencing technical issues. At this point it just felt like Mr. Lee was intentionally nit-picking issues to reprimand Plaintiff for.

26. On or around January 29, 2019, while still reporting to the office in person, Plaintiff received a berating email, this time from the Claims Director, after she informed him that

she and her fellow claims adjusters were not provided with the coverage note template after being told that they needed to use it. Upon learning this, Mr. Lee, Claims Manager called Plaintiff to apologize for this behavior, acknowledged that it was his failure to not have sent the coverage note template to all of the Adjusters, and indicated that he would inform the Claims Director, as such. During this call, Plaintiff informed the Claims Manager that this consistent and constant hostile behavior had taken a toll on her, and has made her feel unwelcome, unappreciated, and unsupported in her workplace. The Claims Manager apologized and promised the Plaintiff that he would improve—but he did not.

27. On or around January 30, 2019, while still reporting to the office in person, the Claims Manager, Andrew Lee, sent the team the coverage note template after the Plaintiff had requested it once again via email. That same day, Plaintiff attended a Claims Team meeting, during which the new adjuster made jokes regarding their ability to work from home and having their workspaces heated, while the remaining team members, who were all African American, were forced to work in-person in the office without heat because the heat had malfunctioned. Working in a cold office space created an environmentally oppressive atmosphere.

28. On or around March 1, 2019, while still reporting to the office in person, Mr. Lee, Claims Manager, informed the team that CEO Ed Arovas had left the company and that the new focus was on downsizing. He further elaborated that this move provided the team with additional funds and more leeway to operate the business without the restraints of Mr. Arovas. The Plaintiff once again renewed her request to telework but at this time was told that it was not a priority.

29. On or around March 14, 2019, while still reporting to the office in person, Plaintiff received a call from the Claims Manager, Andrew Lee, who stated that he was aware that the Plaintiff was receiving more claims than anyone else on the team, and that he would work to ensure that the claims were dispersed more evenly. The Claims Manager also stated that he would work to assist the other adjusters to become licensed like she was, so that they could assist with her overwhelming workload.

30. On or around March 15, 2019, while still reporting to the office in person, the Claims Manager reinstated the Plaintiff's settlement authority.

31. Then on or around May 7, 2019, Plaintiff was involved in a car accident where she sustained severe injuries to her legs and needed medical attention. The Plaintiff informed the Claims Manager of the accident and the severity of the impact. Despite Plaintiff's condition, Mr. Lee ordered another Claims Adjuster, "JJ", to report to the Plaintiff's accident site so that she could escort her to work. The Plaintiff again advised Mr. Lee that her injuries were severe and that she needed to be evaluated by a medical professional. Ms. JJ arrived at the scene and observed the severity of the accident. In response, Ms. JJ profusely apologized to the Plaintiff because she had been ordered to go to the scene and drive her to work, which was a completely insensitive directive orchestrated by Defendant.

32. On or around June 6, 2019, while still reporting to the office in person, Plaintiff informed the Claims Manager that she was the recipient of a contest which permitted her to attend a reputable insurance conference. The Plaintiff inquired with Mr. Lee about whether she would be able to attend this conference on behalf of the company. In response, she was told that the company would not provide expenses for her accommodations or travel, and

that Plaintiff would have to utilize her vacation time in order to attend. During her onboarding, however, the Plaintiff was informed that all related training and professional development conferences and events were highly encouraged and would be supported. The Claims Manager did, however, agree that this would be a great opportunity and that if she did attend, she should present her findings to the department upon her return. In a surprising contrast, Plaintiff later learned that the Executive Assistant, a Caucasian, female, had attended an all-expenses paid two-week conference unrelated to her field a few weeks prior.

33. On or around August 1, 2019, while still reporting to the office in person, the Plaintiff received an email from the Claims Manager, who then immediately called to discuss it. The Plaintiff informed Mr. Lee that she had not yet had an opportunity to review its contents. In response, Mr. Lee began shouting at Plaintiff, stating that he called to make sure that she understood the email and exclaimed that he is the manager. The Plaintiff politely informed Mr. Lee that he has behaved this way before and that it was not only unproductive, but that is also created a hostile and anxious work environment for her. The Plaintiff further expressed that he consistently sends an unreasonable amount of emails, which are immediately followed by phone calls, even though he is aware of her excessively heavy workload. The Plaintiff's coworkers observed this conversation as it was taking place on speakerphone.

34. On or around August 23, 2019, while still reporting to the office in person, Plaintiff followed up on a request to telework the week before her wedding as well as the paid time-off request she had submitted for the weekend of her wedding and her honeymoon. She received a response that her telework request would be denied since she did not possess a

company computer or a company phone. The Plaintiff replied that there was an extra company laptop available that operated all of the required programs, including the Fusion telephone application, which facilitates calls from the laptop. Mr. Lee responded that he would have to look into the matter further before making a decision on the request. Eventually, the Plaintiff's paid time-off request was approved, but she never received a response about her telework request. Despite her heavy workload, Plaintiff continued to receive new claims up until the day she left.

35. On or around September 23, 2019, while still reporting to the office in person, Plaintiff received a call from the Claims Manager who informed her that he had incorrectly entered her paid time-off in the system, but that he would correct it shortly. He also informed her that while she was away, her desk was in great working order, and that he would give her a day off from receiving new assignments, so that she could catch up on emails.

36. On or around September 26, 2019, while still reporting to the office in person, Plaintiff was requested to report to the conference room to meet with the Claims Director, Claims Manager, and Human Resources Coordinator. Without warning, the Plaintiff was informed that she was being terminated. When the Plaintiff inquired about the reasoning for this decision, the Claims Director responded with insults, an irate tone, and debasing comments. When Plaintiff inquired for specifics, both the Claims Manager and Claims Director could not provide any incidents, but rather stated generally that she was a failure and had failed in her position. The Plaintiff continued to request elaboration, to which she was handed a packet and asked to leave the premises. The packet included insurance information and a Severance Agreement, which Plaintiff did not sign.

37. Based on reason and belief, Plaintiff was treated disparately in comparison to her Caucasian colleagues and was subjected to a hostile work environment based on race and sex as an African American woman by Defendant.

## COUNT I

### Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964

38. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

39. A *prima facie* case of race discrimination requires a showing of four (4) elements: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

40. Title VII prohibits discrimination against employees on the basis of sex, race, as well as retaliation, as relevant here. *See* 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 2000e-3(a)(1994)"). Due to the similarity between state and federal law, Maryland courts usually defer to the "federal criteria and seek guidance from Federal Title VII decisions in determining a violation of the analogous State and county provisions." *Muse-Ariyoh v. Board of Education*, 235, 242 (Md. App. 2017).

41. Plaintiff is an African American woman and is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964.

42. Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964.

43. Plaintiff was regularly and consistently subjected to unlawful and prejudicial treatment by her superiors based upon her position as a protected class member.

44. Plaintiff was denied benefits and requests that were provided to Caucasian employees of similar stature and qualifications.

45. Defendants have a history of disparately treating African American employees with greater scrutiny and reprimand than that of Caucasian employees.

46. Plaintiff was dismissed for prejudicial reasons, as her work personnel record was flawless and her accomplishments during her tenure were exemplary.

47. The difference in treatment sufficiently demonstrates that the adverse employment action received by the Plaintiff gives an inference of race discrimination and prejudice. Plaintiff has suffered significant emotional, physical, and financial distress as a result of the unlawful actions and conduct of the Defendant.

**WHEREFORE**, Plaintiff respectfully requests that the Court GRANT an award of compensatory damages against Defendant that exceeds $500,000, specific performance, and award such other and further relief deemed fair and just.

## COUNT II

### Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964

48. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

49. A *prima facie* case of sex discrimination requires a showing of four (4) elements: (1.) she is a member of a protected class; (2.) she was qualified for the position; (3.) she suffered an adverse employment action; and (4.) the action occurred under circumstances giving rise to an inference of discrimination.

50. Md. State Government ("S.G.") Code Ann. § 20-606 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, prohibit discrimination against employees

on the basis of sex, race, as well as retaliation, as relevant here. *See* 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 2000e-3(a)(1994)"). Due to the similarity between state and federal law, Maryland courts usually defer to the "federal criteria and seek guidance from Federal Title VII decisions in determining a violation of the analogous State and county provisions." *Muse-Ariyoh v. Board of Education*, 235, 242 (Md. App. 2017).

51. Plaintiff is an African American woman and is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964.

52. Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964.

53. Plaintiff was denied benefits and requests that were provided to Male employees of similar stature and qualifications.

54. Defendants have a history of disparately treating female employees with greater scrutiny and reprimand than that of male employees.

55. Plaintiff was dismissed for prejudicial reasons, as her work personnel record was flawless and her accomplishments during her tenure were exemplary.

56. The difference in treatment sufficiently demonstrates that the adverse employment action received by the Plaintiff gives an inference of sex discrimination and prejudice.

57. Plaintiff has suffered significant emotional, physical, and financial distress as a result of the unlawful actions and conduct of the Defendant.

**WHEREFORE**, Plaintiff respectfully requests that the Court GRANT an award of compensatory damages against Defendant that exceeds $500,000, specific performance, and award such other and further relief deemed fair and just.

## COUNT III

### Wrongful Termination

58. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

59. Employment agreements in Maryland are presumptively at-will. However, a contract may "overcome that presumption and create an employment relationship whereby the employee may be terminated only for just cause." *Harig v. Progress Rail Servs. Corp.*, 166 F. Supp. 3d 542, 550, 2015 U.S. Dist. LEXIS 169896, *14. *See also Towson Univ. v. Conte*, 384 Md. 68, 862 A.2d 941, 947 (Md. 2004).

60. Plaintiff and Defendant acquiesced and memorialized an at-will employment agreement on April 19, 2018.

61. Plaintiff maintained and fulfilled all of her obligations and responsibilities as outlined in the employment agreement.

62. Plaintiff did not at any point during her employment with the Defendant violate any section stipulated in the at-will employment agreement.

63. Defendant dismissed Plaintiff from her position for unknown and unjustified reasons as her work performance and personnel record were nothing short of exemplary.

64. Defendant's decision to terminate Plaintiff is directly related to Plaintiff's status as a protected class member under Title VII of the Civil Rights Act of 1964.

65. Defendant's decision to terminate Plaintiff is against the public policy foundations of an at-will agreement.

66. Defendant's unlawful conduct has caused the Plaintiff to suffer substantial emotional, physical, and financial distress.

**WHEREFORE**, Plaintiff respectfully requests that the Court GRANT an award of compensatory damages against Defendant that exceeds $500,000, specific performance, and award such other and further relief deemed fair and just.

## COUNT IV

### Hostile Work Environment as a Result of Race and Sex Discrimination

67. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

68. When hostile work environment is alleged to have occurred as a result of unlawful discrimination, Complainant must show that: (1) she belongs to a statutorily protected class; (2) she was subjected to harassment in the form of unwelcome verbal or physical conduct; (3) the harassment complained of was based on her statutorily protected class; (4) the harassment affected a term or condition of employment[1] and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability. *See Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982); *Humphrey v. United States Postal Service*, EEOC Appeal No, 01965238 (October 16, 1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21 (1993).

69. Plaintiff belongs to a statutorily protected class as an African American woman.

70. Plaintiff was subjected to continuous harassment in the forms of verbal and physical conduct from the Defendant and agents of the Defendant.

---

[1] The phrase "terms, conditions and privileges of employment" in Title VII is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with racial discrimination (or retaliation). One can readily envision working environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of group of workers. *Rogers v. EEOC*, 454 F.2d 234 (1971).

71. Plaintiff was subjected to continuous harassment in the forms of verbal and physical conduct from the Defendant and agents of the Defendant that was directly related to her position as a statutorily protected class member.

72. The harassment that the Plaintiff was subjected to unreasonably interfered with her ability to complete her responsibilities by creating an intimidating, hostile, or offensive work environment that she did not feel safe in attending on a daily basis.

73. The above conduct was enabled and encouraged by the Defendant and was unwelcome by the Plaintiff.

74. Defendant's inability to cease the above conduct and repair the effects of this unlawful personnel action demonstrates that they were a contributing factor to the hostile work environment experienced by the Plaintiff.

75. Plaintiff has suffered irreparable harm, both professionally and personally, as a result of this unlawful conduct.

## COUNT V

**Maryland Fair Employment Practices ACT (FEPA). Md. Code §20-601 et seq.**

76. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

77. The Maryland Fair Employment Practices Act (FEPA), Md. Code Ann., State Gov't, § 20-601 *et seq*. outlaws discrimination in employment based on race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability by employers with more than 15 employees.

78. Under FEPA, an employer can be held legally responsible if the person responsible for the harassment can make or recommend employment decisions (e.g., hiring and firing,

promotion and demotion, and reassignments) **or** directs, supervises, or evaluates the work activities of the employee, even if that person does not have the power to make employment decisions. Additionally, an employer can be liable if its own negligence leads to harassment or enables harassment to continue.

79. Harassment is unwelcome or offensive conduct that is based on "race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability."

**WHEREFORE**, Plaintiff respectfully requests that the Court GRANT an award of compensatory damages against Defendant that exceeds $500,000, specific performance, and award such other and further relief deemed fair and just.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Honorable Court:

1. Award damages including but not limited to repayment to Plaintiff, out of pocket expenses, and ancillary expenses and costs;
2. Award compensatory damages in the amount of $500,000.
3. Enter a declaratory judgement finding that the foregoing actions of Defendant violated Maryland law;
4. Enter an amount equal to the tax on any award, interest, and costs;
5. Enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal conduct described herein and to prevent similar occurrences in the future;
6. Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and
7. Order such other relief as this Court deems just and equitable.

### JURY TRIAL

Plaintiff requests a jury trial for all issues so triable herein.

Dated: June 18, 2021

Respectfully submitted,

By: /s/ Dionna Maria Lewis

Dionna Maria Lewis, Esq.
(Bar No. 19486)
District Legal Group, PLLC
700 Pennsylvania Ave SE, Suite 2098
Washington, D.C. 20003
Tel. (202) 486-3478 |
Dionna@DistrictLegalGroup.com

*Counsel for Aziza DeBrossard-Sharp*